## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

JACQUELINE BARNEY, individually and on behalf of all other similarly situated,

        Plaintiff,

        v.

GRAND CARIBBEAN CRUISES, INC.,

        Defendant.

_____/

**CASE NO.: 21-CV-61560-RAR**

**CLASS ACTION**

### DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Defendant Grand Caribbean Cruises, Inc. ("GCC") moves to compel arbitration and to dismiss this action under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA") and Federal Rule of Civil Procedure 12(b)(1). Alternatively, GCC moves to compel arbitration and to stay this proceeding under Section 3 of the FAA until the arbitrator enters a final award.

### PRELIMINARY STATEMENT

Plaintiff Jacqueline Barney filed her Class Action Complaint on June 30, 2021, asserting one cause of action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA"). In response to GCC's initial Motion to Compel Arbitration, Plaintiff filed the First Amended Class Action Complaint, (Dkt. No. 12) ("FAC"), which was amended to proactively seek to avoid Plaintiff's agreement to arbitrate. However, when Plaintiff signed up on a website to enter a sweepstakes and consented to receive telephone calls regarding GCC, Plaintiff expressly agreed to arbitrate the TCPA claim she asserts against GCC and waived her right to a jury trial as well as to bring a class action suit or class arbitration against GCC.

In the FAC, Plaintiff admits that she visited the Site and submitted her information. In fact, she alleges that is how GCC obtained her telephone number to then call her. That could only have been done, though, if Plaintiff had agreed to the Terms and Conditions on the Site and

the agreement to arbitrate.  It is impossible to submit an entry and for a lead to be generated without providing such agreement.  Moreover, the arbitration agreement Plaintiff assented to includes a clause giving the arbitrator "exclusive and sole authority to resolve any dispute relating to the interpretation, construction, validity, applicability, or enforceability of these Terms, the Privacy Policy, and this arbitration provision."  Thus, any disputes as to the validity, enforceability, or the conspicuousness of the Terms and Conditions or the agreement to arbitrate have been delegated to an arbitrator who is to decide those issues, not the Court.  GCC's Motion to Compel Arbitration can and should be granted solely on the basis of the delegation provision.

Even if the Court is of the view that it, and not an arbitrator, is to decide the enforceability and validity of the arbitration agreement that Plaintiff entered into and which covers her claim against GCC, the result should be the same.  For the reasons detailed below, and under settled principles of law and in furtherance of the strong federal policy in favor of enforcement of agreements to arbitrate, the Court should dismiss Plaintiff's FAC and compel her to proceed to arbitration on her TCPA claim.

## STATEMENT OF FACTS

Plaintiff commenced this putative class action on June 30, 2021 regarding at least one telephone call she allegedly received on or about January 28, 2021 about GCC.  *See generally* Compl. (Dkt. No. 1).  On September 9, 2021, in response to GCC's Motion to Compel Arbitration, (Dkt. No. 7), Plaintiff filed the FAC.  *See* Dkt. No. 12.  The FAC asserts a single cause of action under the TCPA.  *See id.* at ¶¶ 42-51.  Plaintiff seeks to represent a nationwide class of persons "who, within the four years prior to the filing of this Complaint, were called by Defendant with a prerecorded voice message on their telephone number regarding Defendant's property, goods, and/or services."  *Id.* at ¶ 32.

On August 15, 2020, Plaintiff visited a website bearing the trademark "Dream Trips," more specifically http://dreamtripsusa.net/0327grpwowcrg/ (the "Site"), which is owned and operated by Acquis, LLC under the trade name "Dream Trips."  Declaration of Daniel Connolly at ¶ 4.  Plaintiff concedes in the FAC that she visited the Site.  *See* FAC at ¶¶ 15-20 (allegations

about Plaintiff's visit to the Site).  Upon landing on the Site, Plaintiff entered a sweepstakes to win a $5,000 American Express gift card by providing her name, e-mail address, and telephone number, clicking a box to "consent to receive . . . calls about offers and deals from an automatic dialing system and/or pre-recorded voice technology from or on behalf of . . . ***Grand Caribbean Cruises***" and "agree to the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page," and clicking a "SUBMIT ENTRY" link.  *Id.* at ¶¶ 4-7, 11-12, 21, Exhibits A & B thereto (emphasis added).

Thus, GCC was expressly named on that landing page as one of the advertisers or partners that Plaintiff was consenting to receive calls about.  *Id.* at ¶¶ 11, 21, Exs. A & B thereto. Along with a shortened version of her name – "Jaqui Barney" – Plaintiff submitted an email address of jaqsrbetter@gmail.com and a telephone number of (816) 679-6225.  *Id.* at ¶ 10, Ex. A thereto.  That is the telephone number Plaintiff alleges was called by GCC.  *See, e.g.,* FAC at ¶ 21.  Plaintiff concedes that she submitted her contact information on the Site.  *Id.* at ¶ 19.

Clicking on the hyperlink for the "Terms and Conditions" on the Site opens a new browser window that contains the Terms and Conditions being agreed to.  They begin:

> PLEASE READ THESE WEBSITE TERMS AND CONDITIONS CAREFULLY BEFORE ACCESSING, USING, OR SIGNING UP FOR AN OFFER OR PROMOTION ON www.dreamtripsusa.net, facebook.com/dreamtripsusa, and any other dreamtripsusa website (COLLECTIVELY, "DREAM TRIPS™ Websites").  BY ACCESSING, USING, OR SIGNING UP OVER THIS WEBSITE OR ANY OTHER DREAM TRIPS™ WEBSITE, YOU ACCEPT AND AGREE TO THESE TERMS AND CONDITIONS ("TERMS"). THESE TERMS CONTAIN DISCLAIMERS OF WARRANTIES (see Section 7) LIMITATION OF LIABILITIES (see Section 8), AND LIABILITY RELEASE (see Section 9).  THESE TERMS FORM AN ESSENTIAL BASIS OF OUR AGREEMENT.  PLEASE PRINT AND RETAIN A COPY OF THIS AGREEMENT FOR YOUR RECORDS.
>
> THIS AGREEMENT CONTAINS ARBITRATION AND CLASS ACTION WAIVER PROVISIONS THAT WAIVE YOUR RIGHT TO A COURT HEARING, RIGHT TO A JURY TRIAL AND RIGHT TO PARTICIPATE IN A CLASS ACTION.   ARBITRATION IS MANDATORY AND IS THE EXCLUSIVE REMEDY FOR ANY AND ALL DISPUTES UNLESS SPECIFIED BELOW IN SECTION 10 OR IF YOU OPT-OUT.   PLEASE

> CAREFULLY REVIEW THE DISPUTE RESOLUTION PROVISIONS IN
> SECTION 10 BELOW WHICH ALSO DESCRIBES YOUR RIGHT TO OPT-
> OUT.

Connolly Decl., Ex. C at 1.

Thus, the Site conspicuously identifies the mandatory arbitration and class waiver
provisions at the outset of the Terms and Conditions in fully capitalized – "all caps" – text.  The
Terms and Conditions proceed in the next paragraph to include advertisers and third party
partners such as GCC within the scope of the Terms and Conditions:

> DREAM TRIPS™ Websites promote discount offers of our own, *as well as those*
> *provided by affiliates, advertisers and third party partners (collectively,*
> *"Partners")*, that feature a wide variety of offers including but not limited to
> vacations, general merchandise, home services, sweepstakes, and products for
> seniors ("Offers" or "Promotions").  When signing up for Offers or Promotions or
> otherwise accessing or using any DREAM TRIPS™ Website, you represent and
> agree to the following:  You enter into a binding agreement us and accept these
> Terms . . . .

*Id.* (emphasis added).

The arbitration provision appears at Section 10 (the "Arbitration Agreement").   It
provides, in part:

> YOU AGREE THAT ANY CLAIM THAT YOU MAY HAVE IN THE
> FUTURE MUST BE RESOLVED THROUGH FINAL AND BINDING
> CONFIDENTIAL ARBITRATION.  YOU ACKNOWLEDGE AND AGREE
> THAT YOU ARE WAIVING THE RIGHT TO A TRIAL BY JURY. . . .
>
> YOU AGREE THAT YOU MAY ONLY BRING A CLAIM IN YOUR
> INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF (LEAD OR
> OTHERWISE) OR CLASS MEMBER IN ANY PURPORTED CLASS OR
> REPRESENTATIVE PROCEEDING. . . .
>
> YOU AND WE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS
> BETWEEN US IN INDIVIDUAL, BINDING, AND CONFIDENTIAL
> ARBITRATION.  THAT INCLUDES, BUT IS NOT LIMITED TO, ANY
> CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE
> RELATIONSHIP BETWEEN US; (ii) THESE TERMS OR THE AGREEMENT;
> (iii) THE PRIVACY POLICY; (iv) *ANY TELEMARKETING OR OTHER*
> *CALL OR MESSAGE (INCLUDING BUT NOT LIMITED TO SMS*

*MESSAGES) YOU CLAIM TO HAVE RECEIVED FROM US OR ONE OF OUR PARTNERS*; (v) ANY E-MAIL YOU CLAIM TO HAVE RECEIVED FROM US OR ONE OF OUR PARTNERS; (vi) YOUR USE OR ATTEMPTED USE OF ANY DREAM TRIPS™ WEBSITE; OR (vii) ANY OFFERS OR PROMOTIONS. THIS SECTION APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY. . . .

The arbitrator shall have the exclusive and sole authority to resolve any dispute relating to the interpretation, construction, validity, applicability, or enforceability of these Terms, the Privacy Policy, and this arbitration provision. The arbitrator shall have the exclusive and sole authority to determine whether any dispute is arbitrable. The arbitrator shall have the exclusive and sole authority to determine whether this arbitration agreement can be enforced against a non-signatory to this agreement and whether a non-signatory to this agreement can enforce this provision against you or us. . . .

*Id.* at § 10 (emphasis added).

The Arbitration Agreement is also referred to in Section 5 of the Terms and Conditions. After stating the consumer's agreement that they have provided prior express written consent "to receive telemarketing telephone calls, including artificial voice calls, pre-recorded messages and/or calls delivered via automated technology," among other things, the Terms and Conditions provide, "[t]o the extent that you believe you have a legal or equitable claim against us or the Partners under any telemarketing law, including but not limited to, the TCPA, *the mandatory and binding arbitration and class action and jury trial waiver provisions in Section 10 below shall apply*." *Id.* at § 5 (emphasis added).

**ARGUMENT**

I.      **LEGAL STANDARDS**

Section 4 of the FAA permits a court to compel arbitration when one party, as in this case, has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4. *See also*, *e.g.*, *McDougal v. Comcast Corp.*, No. 16-81906-CIV, 2017 WL 3726040, *2 (S.D. Fla. Feb. 24, 2017). Arbitration agreements are governed by and enforceable under the FAA.

5

*See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23-24 (1991).   "Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2009) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)).   The FAA and the strong federal policy favoring arbitration that it evidences require courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).   Consistent with that strong federal policy favoring arbitration, "[f]ederal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Id.* (citing *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).   *See also Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (explaining that "it is the role of courts to 'rigorously enforce agreements to arbitrate'" and to construe any doubt in favor of arbitrability).   "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25.

A district court must consider three factors on a motion to compel arbitration: "(1) whether a valid agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived." *Pierre-Louis v. CC Solutions, LLC*, No. 17-60781, 2017 WL 4841428, \*2 (S.D. Fla. Oct. 26, 2017) (citing *Nat'l Auto Lenders, Inc. v. Syslocate, Inc.*, 686 F. Supp. 2d 1318, 1322 (S.D. Fla. 2010)).   A motion to compel arbitration is treated as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.   *See Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1292 (S.D. Fla. 2017) (citing *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)).   Accordingly, in ruling on a motion to compel arbitration, the Court may consider matters outside of the four corners of the complaint.   *Id.*

I.       THE COURT SHOULD COMPEL ARBITRATION

     A.       A Valid Written Arbitration Agreement Exists

Plaintiff entered into a valid agreement requiring her to arbitrate her TCPA claim against GCC when she agreed to the Terms and Conditions on the Site, including the Arbitration Agreement, when she submitted her sweepstakes entry.  While the Court should find that this is an issue that has been delegated to the arbitrator, even if the Court takes up this question in deciding whether arbitration can be compelled, it should find in the affirmative.

          1.       The Question of the Existence of a Valid Written Arbitration Agreement Has Been Delegated to the Arbitrator

As a threshold issue, the Arbitration Agreement includes a clause giving the arbitrator "exclusive and sole authority to resolve any dispute relating to the interpretation, construction, validity, applicability, or enforceability of these Terms, the Privacy Policy, and this arbitration provision."  Connolly Decl., Ex. C at § 10.  Plaintiff does not dispute that she went on the Site and submitted her information, thus agreeing to the Terms and Conditions, including the Arbitration Agreement.  *See* FAC at ¶¶ 15-20.  In fact, she alleges that "Defendant purchased Plaintiff's lead information, including her telephone number, from Acquis, LLC, which owns and operates the [Site]," (FAC at ¶ 12), something that can occur only if Plaintiff had "checked the above-referenced checkbox and then clicked the 'Submit Entry' button."  Connolly Decl. at ¶ 14.  Rather, what Plaintiff disputes is the validity or enforceability of the Arbitration Agreement. *See*, *e.g.*, FAC at ¶ 17 ("Plaintiff was never given actual or constructive notice of any arbitration agreement Defendant may seek to enforce and did not manifest assent to any such terms.").

The above-quoted delegation provision in the agreement to arbitrate, which Plaintiff agreed to, indisputably sends the question of the validity and enforceability of the Arbitration Agreement along with any "gateway" issues to the arbitrator as a dispute delegated to him or her to resolve. *See, e.g., Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("[C]ourts must enforce arbitration contracts according to their terms.  Applying the Act, we have held that parties may agree to have an arbitrator decide not only the merits of a

particular dispute but also ''gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'") (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 440 (2006) ("a challenge to the validity of a contract as a whole, and not specifically to the arbitration clause within it, must go to the arbitrator, not the court"); *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (upholding "delegation provision" in arbitration agreement in which parties had "agree[d] to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement"). The Court should therefore compel arbitration on this basis alone.

### 2.    In the Alternative, the Court Should Find Plaintiff Entered Into a Valid Arbitration Agreement

Nevertheless, if the Court is of the view that it can and should decide the existence and validity of the Arbitration Agreement, it is plainly evident that both are established here with respect to the Arbitration Agreement Plaintiff entered into on the Site.

Federal law provides that a written provision to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[U]nder the FAA, no party can be compelled to arbitrate unless that party has entered into an agreement to do so." "[W]hen determining whether an arbitration agreement exists, 'courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'" *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (citations omitted). Thus, the "threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.'" *Greenberg v. Doctors Assocs., Inc.*, No. 1:18-CV-22505-UU, 2018 WL 4927910, *1 (S.D. Fla. Aug. 29, 2018) (internal citation omitted). A valid agreement to arbitrate is formed where there is mutual assent to certain and definite contractual terms, such as the agreement the Plaintiff entered into on the Site. *See id.* at *2.

Even in this age of internet commerce, traditional contract-based principles of offer and acceptance still guide the determination of whether a valid arbitration agreement exists. *See*

*Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) ("whether an arbitration agreement exists at all is simply a matter of contract") (internal quotations and citations omitted); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) (commerce conducted over the internet "has not fundamentally changed the principles of contract").  By clicking on the box that appeared next to language explaining that "[b]y entering" the sweepstakes "I confirm that I . . . agree to the . . . Terms & Conditions that are hyperlinked at the bottom of the page "and the "Submit Entry" button, (Connolly Decl. at ¶¶ 5-14, 21, Exs. A, B, C), as Plaintiff admits she did, (FAC at ¶ 19), Plaintiff indisputably agreed to the Arbitration Agreement that governs her claims here.

One of the primary means of forming a contract on the Internet is the "'clickwrap' (or 'click-through') agreement, in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use." *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013) (quoting *Hines v. Overstock.com*, 668 F.Supp.2d 362, 366 (E.D.N.Y. 2009).  *See also*, e.g., *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018) (explaining clickwrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of an agreement to the terms of service before he or she is allowed to proceed with further utilization of the website") (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015)).[1]

"Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (*citing Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 837 (S.D.N.Y. 2012) (collecting cases)).  *See also Temple*, 360 F. Supp. 3d at 1302 (observing that

---

[1] This is in contrast to a browsewrap agreement, which "occurs when a website merely provides a link to the terms and conditions *and does not require the purchaser to click an acknowledgement during the checkout process*."  *Bell v. Royal Seas Cruises, Inc*., No. 19-CIV-60752-RAR, 2020 WL 5639947, *5 (S.D. Fla. Sept. 21, 2020) (emphasis added) (quoting *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018)).  *See also Temple*, 360 F. Supp. 3d at 1302 ("Generally, a browsewrap agreements consists of a notice on a website stating that the user is agreeing to and is bound by the website's terms of service by merely using the website.").

"courts generally find" "[c]lickwrap agreements" "enforceable"); *Whitt v. Prosper Funding LLC*, No. 1:15-CV-136-GHW, 2015 WL 4254062, *5 (S.D.N.Y. July 14, 2015) (collecting cases).

That is exactly what Plaintiff did on the Site. As detailed in the accompanying Declaration of Daniel Connolly, Plaintiff checked a box signifying her agreement to, among other things, "the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page":



*See generally* Connolly Decl. and Exs. A & B thereto.

Plaintiff had to agree to the above language by checking the box in order to be able to submit an entry and for a lead to be generated by the Site. Connolly Decl. at ¶ 14. Indeed, as Mr. Connolly explains, if a user on the Site attempts to submit an entry without checking that box, "a message stating 'Please select one or more options,' with an arrow pointing to the blank checkbox, appears on their screen and they will not be allowed to progress on the Site unless and until the checkbox is checked." *Id.* This is what the visitor would see in that situation:

The clickwrap agreement to arbitrate as well as the accompanying hyperlink to the Terms and Conditions thus were conspicuous and clear and placed Plaintiff on inquiry notice so as to validly bind her to the terms she was agreeing to, including the Arbitration Agreement. In *Bell*, this Court found that "the Website's design is such that the hyperlink to the terms and conditions is sufficiently conspicuous to put a reasonably prudent user on inquiry notice of the terms of the

contract" where "[t]he sentence regarding the applicability of the Terms and Conditions . . . is placed directly above the 'Continue' button that any user must click to proceed with using the website" "[b]ecause it is nearly impossible that any user would not see that statement before hitting 'Continue.'" *Bell*, 2020 WL 5639947 at *6.  ***The exact same is true here with Plaintiff.***

Plaintiff thus was made aware of the Arbitration Agreement on the Site (in the Terms and Conditions) and affirmatively expressed her agreement to it.  *See generally* Connolly Decl. & Exs. A & B thereto.  In fact, she was "require[d] . . .  to click an acknowledgement during the [submission] process." *Bell*, 2020 WL 5639947 at *5.  Moreover, a "video playback" using data tracked by an industry leader in lead validation and verification, ActiveProspect, during Plaintiff's visit to the Site provides visual evidence of her visit.  *Id.* at ¶¶ 16-21 & Ex. F thereto.  Plaintiff therefore cannot dispute that she agreed to the Terms and Conditions and there is a valid agreement to arbitrate.[2]

In the FAC, Plaintiff does not dispute that she visited the Site and submitted her information, which she contends was sold to GCC and that is how she was called.  *See* FAC at ¶¶ 12, 19, 21.  Again, that could not have been done without Plaintiff checking a box that informs the visitor that she is agreeing to the Terms and Conditions that are hyperlinked below.  *See* Connolly Decl. at ¶ 14 & Ex. B thereto.  Instead, she contends the font size, color, non-underlined hyperlinks, and layout of the Site failed to "give[ ] actual or constructive notice of any arbitration agreement Defendant may seek to enforce . . . ." FAC at ¶ 17.  *See also id.* at ¶¶ 14-20.  None of these criticisms add up.

To begin with, despite somehow alleging that the "comparatively miniscule size of the

---

[2] Where the issue is before a court, the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.  The Court applies a "summary judgment-like standard" and consequently "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore*, 827 F.3d at 1333 (quoting Fed. R. Civ. P. 56(a)).  "A Plaintiff can raise a genuine issue of fact regarding the validity of an arbitration agreement by (1) making an unequivocal denial that there was an agreement, and (2) producing evidence to substantiate the denial." *Hilton v. Fluent*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018) (citation and internal quotations omitted).

typeface used to notify" visitors to the Site that "they are purportedly agreeing to certain 'Terms & Conditions' and its light grey color render it practically unreadable," (*id.* at ¶ 15), the supposed "screenshot" included in the FAC is plainly legible.  *See* FAC at 5.  But far more troubling, it is unclear from where that "screenshot" originated.  The FAC does not provide any detail.  As the Managing Member of Acquis, LLC avers, "[t]he submission form that Plaintiff attacks is not even the form that was on the Site on August 15, 2020, the date of Plaintiff's visit to and submission on the Site."  Connolly Decl. at ¶ 24.  Certain language in the "screenshot" about Royal Caribbean did not appear on the Site until just recently, on September 7, 2021.  *Id.* at ¶ 25.  There are also at least seven other differences, including the background color of the submission form (light blue versus pink).  *See id.* at ¶ 26.  Plaintiff's criticisms about the sufficiency of a form that did not even exist at the time of her admitted visit and submission, even if meritorious, are of absolutely no moment when the only relevant form is the one on the webpage she visited on August 15, 2020.  That form and landing page are reflected in the screenshot attached to the Connolly Declaration as Exhibit B.

Plaintiff also alleges the hyperlink to the Site's Terms and Conditions was not underlined. FAC at ¶ 14.  But that is based upon the purported "screenshot" in the FAC, which Mr. Connolly avers "is not an accurate reflection of the submission form as it ever appeared on the site." Connolly Decl. at ¶ 27.  He further swears that it "has never been the case on the Site" that the "Privacy Policy" or "Terms & Conditions" hyperlinks have not been "underlined or underscored."  *Id.* at ¶ 28.  And, indeed, screenshots of the landing page from both August 15, 2020 – the date of Plaintiff's visit and submission – to today, September 23, 2021, show the hyperlinks are in fact ***underlined***.  *Id.* at ¶ 27 & Exs. B and G thereto.  So, too, does the "video replay" from ActiveProspect of Plaintiff's visit to the Site on August 15, 2021.  *See id.* at ¶ 21 & Ex. F thereto.  Moreover, moving the mouse cursor over the "Terms and Conditions" hyperlink changes the cursor to the familiar "pointer hand" icon indicating to the visitor that he or she can click on that link to retrieve the Terms and Conditions.  *Id.* at ¶ 29.

It is unknown if the "screenshot" that appears in the FAC has been manipulated, or

perhaps is a low quality scan of a printout and that is why it is misleading, but it clearly "is not an accurate reflection of the submission form as it ever appeared on the Site," nor can it "possibly be what Plaintiff saw during her visit to the Site . . . on August 15, 2020." *Id.* at ¶¶ 26 & 27. The evidence of what Plaintiff saw and what she was informed of on the Site she admits she visited and submitted her information to is in Exhibit B to the Connolly Declaration. For the reasons discussed above, and as this Court has already found, a website plainly suffices to provide conspicuous notice to a visitor by, among other things, requiring them to check a box that is accompanied by language informing the user that there are terms and conditions and that they are agreeing to them by clicking a button – here "Submit Entry." *See*, *e.g.*, *Bell*, 2020 WL 5639947 at *6 (finding "the Website's design is such that the hyperlink to the terms and conditions is sufficiently conspicuous to put a reasonably prudent user on inquiry notice of the terms of the contract" where "[t]he sentence regarding the applicability of the Terms and Conditions . . . is placed directly above the 'Continue' button that any user must click to proceed with using the website" "[b]ecause it is nearly impossible that any user would not see that statement before hitting 'Continue'").

Furthermore, even though the "screenshot" in the FAC is irrelevant and of questionable origins, it still satisfies the relevant standards. The check box prompt for it still makes clear that "By clicking this box and the Submit Entry button, I consent to receive . . . calls," and that "[b]y entering *I confirm that I am over age 25, agree to the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page*." FAC at 5 (emphasis added). That language, too, places the website visitor on inquiry notice that they are agreeing to certain terms and conditions. Moreover, although Plaintiff's "lack of underline" line of attack has been debunked, "even if the hyperlink to the Terms and Conditions were inoperable, Plaintiff was put on inquiry notice that the parties' agreement was subject to Terms and Conditions," "and was obliged to seek them out . . . ." *Raw Life Organics LLC v. SBL, LLC*, No. 20-61944-CIV, 2021 WL 217765, *5 (S.D. Fla. Jan. 6, 2021), report and recommendation adopted, 2021 WL 217076 (S.D. Fla. Jan. 21, 2021). And she easily could have done so under the layout of even the dubious

"screenshot" that she assails.

The record evidence thus is more than enough to establish that Plaintiff was on notice of the Terms and Conditions and the Arbitration Agreement and that she agreed to them, binding her to the mandatory arbitration provisions.  It is irrelevant that Plaintiff may not have actually clicked on the identified hyperlink for the Terms and Conditions to read them.  *See Sapp v. Warner*, 105 Fla. 245, 141 So. 124, 127 (Fla. 1932) ("[A] person has no right to shut his eyes or ears to avoid information, and then say that he has no notice."); *Meyer*, 868 F.3d at 74-75 ("Where there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.").

### B.      Plaintiff's TCPA Claims Raise Arbitrable Issues

The Arbitration Agreement specifically calls for arbitration of Plaintiff's TCPA cause of action against GCC and clearly advised Plaintiff of the scope of disputes that are covered by the clause.  The question of whether Plaintiff's TCPA claims against GCC are arbitrable is also, however, within the express scope of the Arbitration Agreement's delegation provision, specifically the language that "[t]he arbitrator shall have the exclusive and sole authority to determine whether any dispute is arbitrable."  Connolly Decl., Ex. C at § 10.  As the Supreme Court held, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue.  That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein*, 139 S. Ct. at 529.  This is therefore a question for the arbitrator to decide as well.

Even if the Court were to decide arbitrability, the plain language of the Terms and Conditions shows the parties' intent to have arbitration serve as the primary recourse to resolve TCPA claims against a "Partner" such as GCC regarding telemarketing phone calls.   In determining the scope of the arbitration clause, courts look at the parties' intent to submit the

dispute to arbitration, starting at the language of the arbitration provision, and construing any

doubt in favor of arbitrability in accordance with the strong federal policy favoring arbitration.

*See, e.g., Mitsubishi*, 473 U.S. at 626 ("Thus, as with any other contract, the parties' intentions

control, but those intentions are generously construed as to issues of arbitrability.").

The Arbitration Agreement states, in relevant part:

> YOU AGREE THAT ANY CLAIM THAT YOU MAY HAVE IN THE
> FUTURE MUST BE RESOLVED THROUGH FINAL AND BINDING
> CONFIDENTIAL ARBITRATION.  YOU ACKNOWLEDGE AND AGREE
> THAT YOU ARE WAIVING THE RIGHT TO A TRIAL BY JURY. . . .
>
> YOU AND WE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS
> BETWEEN US IN INDIVIDUAL, BINDING, AND CONFIDENTIAL
> ARBITRATION.  THAT INCLUDES, BUT IS NOT LIMITED TO, ANY
> CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE
> RELATIONSHIP BETWEEN US; (ii) THESE TERMS OR THE AGREEMENT;
> (iii) THE PRIVACY POLICY; (iv) ***ANY TELEMARKETING OR OTHER
> CALL OR MESSAGE (INCLUDING BUT NOT LIMITED TO SMS
> MESSAGES) YOU CLAIM TO HAVE RECEIVED FROM US OR ONE OF
> OUR PARTNERS***; (v) ANY E-MAIL YOU CLAIM TO HAVE RECEIVED
> FROM US OR ONE OF OUR PARTNERS; (vi) YOUR USE OR ATTEMPTED
> USE OF ANY DREAM TRIPS™  WEBSITE; OR (vii) ANY OFFERS OR
> PROMOTIONS. THIS SECTION APPLIES REGARDLESS OF WHETHER
> SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD,
> UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL
> THEORY. . . .

Connolly Decl., Ex. C at § 10 (emphasis added).

That the scope of the broadly-worded Arbitration Agreement extends to TCPA claims

against "Partners" is further made clear in Section 5 of the Terms and Conditions.  After stating

the consumer's agreement that they have provided prior express written consent "to receive

telemarketing telephone calls, including artificial voice calls, pre-recorded messages and/or calls

delivered via automated technology," among other things, the Terms and Conditions provide,

***"[t]o the extent that you believe you have a legal or equitable claim against us or the Partners
under any telemarketing law, including but not limited to, the TCPA, the mandatory and***

15

***binding arbitration and class action and jury trial waiver provisions in Section 10 below shall
apply***." *Id.* at § 5 (emphasis added).

Moreover, the fact that Plaintiff's TCPA claim is a statutory claim does not place it
outside the scope of a valid arbitration agreement.  "It is by now clear that statutory claims may
be the subject of an arbitration agreement, enforceable pursuant to the FAA," "'unless Congress
itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at
issue.'"  *Gilmer*, 500 U.S. at 26 (quoting *Mitsubishi*, 473 U.S. at 628).  "[T]he party seeking to
avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration
of the statutory claims at issue."  *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92
(2000).  Nothing in the text or legislative history of the TCPA evidences any such intention.  In
fact, TCPA claims such as Plaintiff's are routinely compelled to arbitration.[3]

Plaintiff also cannot dispute that GCC, as an intended third party beneficiary of the
Arbitration Agreement, is allowed to enforce the clause and compel arbitration of Plaintiff's
claims.  Once again, this is a question that the Arbitration Agreement both generally – in regards
to resolving any dispute – and ***specifically*** delegates to the arbitrator.  *See* Connolly Decl., Ex. C
at § 10 ("The arbitrator shall have the exclusive and sole authority to determine whether this
arbitration agreement can be enforced against a non-signatory to this agreement and whether a
non-signatory to this agreement can enforce this provision against you or us.").  *Accord Henry
Schein*, 139 S. Ct. at 529-531.  As this Court explained in *Bell*,

> Plaintiff's third-party beneficiary argument is for the arbitrator to decide . . . .
> Here, the subject agreement provides the arbitrator with "exclusive authority to
> resolve any dispute," and any dispute encompasses the third-party beneficiary
> dispute.  Therefore, giving full effect to the terms of the arbitration agreement, the
> Court must defer to the arbitrator on this dispute if arbitration is otherwise
> mandated.

---

[3] *See, e.g., Temple*, 360 F. Supp. 3d at 1307; *Garcia v. Kendall Lakes Auto., LLC*, No. 18-24397-CIV,
2019 WL 1359475 (S.D. Fla. Mar. 26, 2019); *Greenberg v. Doctors Assocs., Inc.*, 338 F. Supp. 3d 1280
(S.D. Fla. 2018); *Drozdowski v. Citibank, Inc.*, No. 2:15-CV-2786-STA-CGC, 2016 WL 4544543 (W.D.
Tenn. Aug. 31, 2016); *Brown v. DIRECTV, LLC*, No. CV 12-08382 DMG EX, 2013 WL 3273811 (C.D.
Cal. June 26, 2013).

2020 WL 5639947 at *4-5.

Again, however, if the Court were to decide this question, it should find in GCC's favor. "[A] non-party to a contract containing an arbitration clause may compel parties to the contract to arbitrate if it is determined that the non-party is a third-party beneficiary to the contract." *Capua v. Air Europa Lineas Aereas S.A. Inc.*, No. 20-CV-61438-RAR, 2021 WL 965500, *5 (S.D. Fla. Mar. 15, 2021) (citing *Peters v. The Keyes Co.*, 402 F. App'x 448, 451 (11th Cir. 2010)). "A third party may invoke the agreement only if the parties to the contract clearly express an intention to confer a benefit on the third party." *Id.* (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 983 (11th Cir. 2005)).

As noted above, here the Arbitration Agreement expressly states that "[t]o the extent you believe you have a legal or equitable claim against us or the Partners under any telemarketing law, including, but not limited to, the TCPA, the mandatory and binding arbitration and class action and jury trial waiver provisions in Section 10 below shall apply." Connolly Decl., Ex. C at § 5. Moreover, Section 10, the Arbitration Agreement itself, expressly states that claims that must be submitted to arbitration include "ANY TELEMARKETING OR OTHER CALL OR MESSAGE . . . YOU CLAIM TO HAVE RECEIVED FROM US **OR ONE OF OUR PARTNERS** . . . ." *Id.* at § 10. These provisions clearly are intended for the direct benefit of the "Partners," including GCC, which is expressly named on the Site in that capacity. *See* Connolly Decl. at ¶¶ 11-14, 21 and Exs. A & B thereto. *Cf. Capua*, 2021 WL 965500, *6 (finding defendant non-signatory was intended third-party beneficiary to arbitration agreement that required arbitration of "any Claims you assert against . . . [our] travel suppliers or any companies offering products or services through us . . . .").

This showing is more than enough to find Plaintiff's TCPA cause of action raises an arbitrable issue. If, however, Plaintiff resists arbitration, she has the "burden of *proving* that the claims at issue are *unsuitable* for arbitration." *Mackler v. Fitness Int'l, LLC*, No. 16-80150-CIV-MIDDLEBROOKS/BRANNON, 2016 WL 7756623, *2 (S.D. Fla. Apr. 22, 2016) (internal citation and quotation omitted) (emphases added). That unsuitability has to be real, not merely a

speculative contention, and cannot undercut the FAA. *Id.* When in doubt, questions of arbitrability are resolved in favor of arbitration. As the Supreme Court made clear long ago, the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Cone Mem'l*, 460 U.S. at 24. Plaintiff cannot possibly displace this showing or presumption, and, in the event the Court does not find this question to have been delegated to the arbitrator, the Court should find the second factor, that an arbitrable issue exists, is satisfied here.

### C. GCC Has Not Waived the Right to Arbitrate Plaintiff's Claims

Finally, GCC has not waived the right to arbitrate Plaintiff's TCPA cause of action. A defendant waives the right to compel arbitration if they act inconsistently with the right to compel arbitration and if their conduct prejudices the plaintiff (for example, by requiring the plaintiff to expend money litigating in court). *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315-16 (11th Cir. 2002). Additionally, "both Florida and federal law favor arbitration, therefore any party arguing waiver of arbitration bears a heavy burden of proof." *Mixed Fighting Alliance Promotions, Inc. v. De La Noval*, No. 11-21107-CIV, 2011 WL 13223750, *4 (S.D. Fla. Oct. 18, 2011). Thus, "questions regarding the waiver of arbitration should be construed in favor of arbitration rather than against it." *Garcia*, 2019 WL 1359475 at *6.

In this case, GCC timely removed Plaintiff's Complaint without any proceedings in the state court and moved to compel arbitration in its initial response to the Complaint. *See* Dkt. No. 7. It is filing this Motion to Compel Arbitration in response to the FAC. Nothing like the kind of delay that has been found prejudicial occurred in the brief history of this litigation, which was commenced in state court less than two months ago on June 30, 2021. *See, e.g., Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1366 (11th Cir. 1995) (finding prejudice where five years elapsed before arbitration as invoked); *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990) (same after twenty month delay). *Cf. Vanwechel v. Regions Bank*, No. 8:17-CV-738-T-23AAS, 2017 WL 1683665, *2 (M.D. Fla. May 3, 2017) ("In contrast, the defendants in this action promptly removed the action, moved

18

within a week of removal to compel arbitration, and submitted no other motion. The removal

establishes no waiver of the right to compel arbitration.").

## II.     THE CASE SHOULD BE DISMISSED, NOT STAYED

Finally, the proper disposition of this case after compelling the parties to proceed to

arbitration should be dismissal.  The FAA provides, in pertinent part, that a court compelling

arbitration "*shall* on application of one of the parties[,] *stay* the trial of the action until such

arbitration has been had in accordance with the terms of the agreement." *Cusolito v. Citibank,*

*N.A.*, No. 0:17-CV-60963-WPD, 2017 WL 8890662, \*3 (S.D. Fla. Oct. 6, 2017) (quoting 9

U.S.C. § 3) (emphasis added).  Despite this statutory language, this District has made clear that

"**[t]he weight of authority clearly supports *dismissal* of the case when *all* of the issues raised**

**in the district court must be submitted to arbitration.**"  *Cusolito* at \*3 (internal citations

omitted) (emphasis added).  *See also Garcia*, 2019 WL 1359475 at \*7 (compelling arbitration

and dismissing TCPA complaint).  Ultimately, "district courts are vested with discretion to

determine whether stay or dismissal is appropriate."  *Cusolito* at \*3 (quoting *Swartz v.*

*Westminister Servs., Inc.*, No. 810-CV-1722-T-30AEP, 2010 WL 3522141, \*2 (M.D. Fla. Sept.

8, 2010)).  This Court should exercise its discretion to compel arbitration and dismiss this case.

### CONCLUSION

For the foregoing reasons, the Court should enter an order compelling the arbitration of

Plaintiff's TCPA cause of action and dismissing this case.  Alternatively, this case must be

compelled to arbitration and the proceedings stayed under Section 3 of the FAA until the

arbitrator enters a final award.

### CERTIFICATE OF GOOD FAITH
### CONFERRAL PURSUANT TO LOCAL RULE 7.1(a)(3)

Undersigned counsel for GCC certifies that on September 21 and 23, 2021, he conferred

with counsel for Plaintiff regarding the subject of this Motion.  Counsel for Plaintiff advised that

Plaintiff opposes the requested relief.

Dated:  September 23, 2021

Respectfully submitted,

By: */s/ Roy Taub*
JEFFREY A. BACKMAN
Florida Bar No. 662501
ROY TAUB
Florida Bar No. 116263
200 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL  33301
(954) 491-1120
jeffrey.backman@gmlaw.com
khia.joseph@gmlaw.com
roy.taub@gmlaw.com
cheryl.cochran@gmlaw.com

*Attorneys for Defendant*
*Grand Caribbean Cruises, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 23, 2021, a true and correct copy of the foregoing document was forwarded to all counsel of record in compliance with the Federal Rules of Civil Procedure.

By: */s/ Roy Taub*
ROY TAUB