UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-61560-RAR

**JACQUELINE BARNEY**,
*individually and on behalf of all
others similarly situated*,

      Plaintiff,

v.

**GRAND CARIBBEAN CRUISES, INC.**,

      Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION

**THIS CAUSE** comes before the Court upon Defendant Grand Caribbean Cruises, Inc.'s Motion to Compel Arbitration and to Dismiss Plaintiff's First Amended Class Action Complaint ("Motion") [ECF No. 19], filed on September 23, 2021. Plaintiff Jacqueline Barney filed a response in opposition to the Motion ("Response") [ECF No. 22] on October 7, 2021; Defendant filed a reply in support on October 19, 2021 [ECF No. 30] ("Reply"); Plaintiff filed a sur-reply on November 5, 2021 [ECF No. 37] ("Sur-reply"); and Defendant filed a sur-surreply on November 15, 2021. The Court has reviewed the briefs and the record and is otherwise fully advised. For the reasons set forth below, it is hereby

**ORDERED AND ADJUDGED** that the Motion [ECF No. 19] is **GRANTED**. Plaintiff's First Amended Complaint [ECF No. 12] ("FAC") is **DISMISSED** *without prejudice*.

## BACKGROUND

Plaintiff alleges that Defendant violated the Telephone Consumer Protection Act by placing prerecorded telemarketing calls to her cell phone. *See generally* Complaint [ECF No. 1-1]. Defendant seeks to compel arbitration, arguing that Plaintiff agreed to an arbitration provision governing this dispute when she visited a sweepstakes website

(http://dreamtripusa.net/0327grpwowcrg/; hereinafter "Website") owned and operated by Acquis, LLC.  Mot. at 2.

Visitors to the Website are prompted to provide identifying information comprising their name, telephone number, and email address.  *See* Declaration of Daniel Connelly [ECF No. 20] ("Connolly Declaration") ¶ 9.  Directly beneath the fields for providing this information is a checkbox with an accompanying statement that reads as follows:

> By clicking this box and the Submit Entry button, I consent to receive e-mail, SMS/Text messages, and calls about offers and deals from an automatic dialing system and/or pre-recorded voice technology from or on behalf of Dream Trips, Grand Caribbean Cruises, [and others] at the telephone number that I have provided above, regardless of whether my phone number is on any Do Not Call registry.  My consent is not a condition of purchase.  By entering I confirm that I am over age 25, agree to the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page.

*Id*. ¶ 11.  The Website's Terms & Conditions, which can be accessed by clicking the hyperlink duly located at the bottom of the page, contain the following provisions:

> THIS AGREEMENT CONTAINS ARBITRATION AND CLASS ACTION WAIVER PROVISIONS THAT WAIVE YOUR RIGHT TO A COURT HEARING, RIGHT TO A JURY TRIAL AND RIGHT TO PARTICIPATE IN A CLASS ACTION. ARBITRATION IS MANDATORY AND IS THE EXCLUSIVE REMEDY FOR ANY AND ALL DISPUTES UNLESS SPECIFIED BELOW IN SECTION 10 OR IF YOU OPT-OUT. PLEASE CAREFULLY REVIEW THE DISPUTE RESOLUTION PROVISIONS IN SECTION 10 BELOW WHICH ALSO DESCRIBES YOUR RIGHT TO OPT-OUT. . . .
>
> DREAM TRIPS™ Websites promote discount offers of our own, as well as those provided by affiliates, advertisers and third party partners (collectively, "Partners"), that feature a wide variety of offers including but not limited to vacations, general merchandise, home services, sweepstakes, and products for seniors ("Offers" or "Promotions").  When signing up for Offers or Promotions or otherwise accessing or using any DREAM TRIPS™ Website, you represent and agree to the following: You enter into a binding agreement us and accept these Terms . . . .

> YOU AND WE AGREE TO RESOLVE ALL DISPUTES AND CLAIMS BETWEEN US IN INDIVIDUAL, BINDING, AND CONFIDENTIAL ARBITRATION. THAT INCLUDES, BUT IS NOT LIMITED TO, ANY CLAIMS ARISING OUT OF OR RELATING TO: (i) ANY ASPECT OF THE RELATIONSHIP BETWEEN US; (ii) THESE TERMS OR THE AGREEMENT; (iii) THE PRIVACY POLICY; (iv) ANY TELEMARKETING OR OTHER CALL OR MESSAGE (INCLUDING BUT NOT LIMITED TO SMS MESSAGES) YOU CLAIM TO HAVE RECEIVED FROM US OR ONE OF OUR PARTNERS; (v) ANY E-MAIL YOU CLAIM TO HAVE RECEIVED FROM US OR ONE OF OUR PARTNERS; (vi) YOUR USE OR ATTEMPTED USE OF ANY DREAM TRIPS™ WEBSITE; OR (vii) ANY OFFERS OR PROMOTIONS. THIS SECTION APPLIES REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED IN CONTRACT, TORT, STATUTE, FRAUD, UNFAIR COMPETITION, MISREPRESENTATION OR ANY OTHER LEGAL THEORY. . . .
>
> The arbitrator shall have the exclusive and sole authority to resolve any dispute relating to the interpretation, construction, validity, applicability, or enforceability of these Terms, the Privacy Policy, and this arbitration provision.  The arbitrator shall have the exclusive and sole authority to determine whether any dispute is arbitrable.  The arbitrator shall have the exclusive and sole authority to determine whether this arbitration agreement can be enforced against a non-signatory to this agreement and whether a non-signatory to this agreement can enforce this provision against you or us.

Connelly Decl., Ex. C, at 1.  After providing her name and contact information while visiting the Website on August 25, 2020, Plaintiff clicked the checkbox acknowledging these terms and then clicked the "Submit Entry" button.  Connelly Decl. ¶ 6.

Defendant obtained the contact information Plaintiff provided to the Website and placed a prerecorded call to Plaintiff's cell phone on January 28, 2021.  FAC ¶¶ 12, 22.  Plaintiff filed a Class Action Complaint on June 30, 2021, in the Seventeenth Judicial Circuit in and for Broward County, Florida.  Compl. at 1.  Defendant removed the action on July 29, 2021 [ECF No. 1], and moved to compel arbitration on August 26, 2021 [ECF No. 7].  Plaintiff filed the FAC on September 9, 2021, and Defendant filed the instant Motion on September 23, 2021.

## **LEGAL STANDARD**

A motion to compel arbitration is treated as a motion under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject-matter jurisdiction. *See Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1228 (S.D. Fla. 2020) (citing *McElmurray v. Consol. Gov't of Augusta–Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). As such, the Court may consider matters outside the four corners of the FAC. *Id.*

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs the enforceability of an arbitration agreement. The FAA requires that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. *See* 9 U.S.C. § 4 (directing that courts must send the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). "Simply put, parties cannot be forced to submit to arbitration if they have not agreed to do so." *Bell v. Royal Seas Cruises, Inc.*, No. 19-60752, 2020 WL 5639947, at *3 (S.D. Fla. Sept. 21, 2020) (quoting *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)).

"[P]arties may agree to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement." *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1264 (11th Cir. 2017) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). If the parties clearly and unmistakably agreed to arbitrate gateway issues, then the arbitrator decides those issues; otherwise, the Court decides any gateway issues. *See id.* at 1267.

Nevertheless, when the making of the arbitration agreement is at issue, courts must find that the parties agreed to the arbitration provision before referring the matter to

arbitration. *See Rent-A-Ctr.*, 561 U.S. at 68 ("The court 'shall' order arbitration 'upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue.'" (quoting 9 U.S.C. § 4)). To determine whether the making of the arbitration agreement is "in issue," courts apply a summary judgment-like standard. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). Thus, "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Id.* (citing FED. R. CIV. P. 56(a)). "A Plaintiff can raise a genuine issue of fact regarding the validity of an arbitration agreement by (1) making an unequivocal denial that there was an agreement, and (2) producing evidence to substantiate the denial." *Hilton v. Fluent*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018) (cleaned up). This determination is to be made solely by the Court with no thumb on the scale toward finding a valid arbitration agreement, so "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (citation omitted).

"Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Emp'rs Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (citation omitted). So "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citations omitted). The Eleventh Circuit "repeatedly has emphasized that '*state law* generally governs whether an enforceable contract or agreement to arbitrate exists.'" *Bazemore*, 827 F.3d at 1329 (citation omitted).

Florida law governs this dispute. Plaintiff has raised choice of law at the eleventh hour, arguing for the first time in her Sur-reply that Missouri law applies. Sur-reply at 1. But Plaintiff was required to raise that issue in her Response. *See Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1208 (11th Cir. 2018). ("Under our precedents, a party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion or response when choice-of-law matters—the sources of non-forum law on which it seeks to rely.").

Even if her invocation of Missouri law were timely, Plaintiff has identified no conflict between the laws of Florida and Missouri. Indeed, Plaintiff arguably concedes that no such conflict exists. Resp. at 12 (quoting a case setting forth Florida law). This is fatal to her argument that Florida law does not apply. *See Nationmotor Club Inc. v. Stonebridge Cas. Ins. Co.*, No. 10-81157, 2013 WL 6729664, at *11 (S.D. Fla. Oct. 29, 2013) ("Because the laws are the same regarding the disputed issues and because both parties rely on Florida law in their briefs, the Court will apply Florida law, too. . . . Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state . . . .") (citation omitted). Thus, the Court exercises its discretion to decline Plaintiff's argument that the analysis should not be limited to Florida law.

## **ANALYSIS**

This dispute turns on whether the Website's design was sufficient as a matter of law to lead to the formation of a contract by clicking the "Submit Entry" button. Defendant moves to compel arbitration under the arbitration provision in the Website's Terms & Conditions. *See generally* Mot. Plaintiff opposes the Motion on three bases: (1) it is for the court, not the arbitrator, to decide the gateway issue of whether a valid arbitration agreement was entered; (2) there is no agreement to arbitrate because Plaintiff was never given actual or constructive notice of any such agreement;

and (3) Defendant cannot enforce any agreement because it is not the party identified in the Terms & Conditions and is not an intended third-party beneficiary. *See generally* Resp. The Court will address each opposing argument in turn.

### a. *Delegation of Gateway Issues*

Defendant correctly argues that the arbitration provision at issue contains a delegation clause making gateway issues arbitrable. However, Plaintiff correctly responds that the Court, not an arbitrator, must determine whether an agreement to arbitrate was made in the first instance.

The Supreme Court has pronounced, in no uncertain terms, that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529-31 (2019). *See also Rent-A-Ctr.*, 561 U.S. at 67 ("The FAA ... requires courts to enforce [arbitration agreements] according to their terms."). Courts look to the wording of a delegation clause to ascertain whether it reflects the requisite "clear and unmistakable intent to arbitrate gateway issues." *Jones*, 866 F.3d at 1267. The requisite intent is present when the clause requires arbitration of "any dispute" concerning gateway issues. *Id.* In this case, the relevant clause delegates "exclusive and sole authority to resolve any dispute relating to the interpretation, construction, validity, applicability, or enforceability of these Terms, the Privacy Policy, and this arbitration provision." Connelly Decl., Ex. C, at 1. This delegation clause clearly and unmistakably evinces an intent to arbitrate gateway issues.

However, before this matter can be referred to arbitration to decide even gateway issues, the Court must find that Plaintiff agreed to the arbitration provision in the first instance. Plaintiff disputes that she did, and the Court must reach this threshold determination regardless of the valid delegation clause. For the reasons set forth in the following section, the Court finds that that the

parties agreed to the arbitration provision and that all other gateway issues shall be decided by the arbitrator.

### b. *Website Design and Assent*

Florida courts recognize two main types of internet contracts: clickwrap agreements and browsewrap agreements. *Bell v. Royal Seas Cruises, Inc.*, No. 19-60752, 2020 WL 5742189, at *5 (S.D. Fla. May 13, 2020), *report and recommendation adopted*, No. 19-60752, 2020 WL 5639947, at *1 (S.D. Fla. Sept. 21, 2020); *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018).

> A clickwrap agreement occurs when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions. A browsewrap agreement occurs when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions.

*Bell*, 2020 WL 5742189, at *5 (quoting *MetroPCS*, 273 So. 3d at 1028) (cleaned up). "Courts generally enforce clickwrap agreements." *Id.* (citing *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2017)). "Browsewrap agreements, however, 'have only been enforced when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice.'" *Id.* (quoting *MetroPCS*, 273 So. 3d at 1028).

Contrary to Plaintiff's arguments, the Website at issue here presents a pure case of clickwrap. In light of the *MetroPCS* analysis, under Florida law, the Website's design checks all the boxes required to provide a reasonable user with inquiry notice that he or she is assenting to the Terms & Conditions. The following is a screenshot of the Website as it appeared on August 15, 2020, when Plaintiff submitted her information:

## Enter to win a $5,000 American Express* Gift Card!

*Dream Trips sponsors this promotion. American Express, American Express Box Logo, and American Express Card Design are trademarks and service marks of American Express, which are not affiliated with this promotion.

### Submit your free entry here:

First Name *

Last Name *

Email *

Phone Number *

☐ By clicking this box and the Submit Entry button, I consent to receive e-mail, SMS/Text messages, and calls about offers and deals from an automatic dialing system and/or pre-recorded voice technology from or on behalf of Dream Trips, Grand Caribbean Cruises, Capital Vacations, Diamond Resorts, WOW Vacations, PCH, Choice Home Warranty, Home Helper, Cinch Home Services, Vacation Play, Westgate Resorts & Vacation Deals USA at the telephone number that I have provided above, regardless of whether my phone number is on any Do Not Call registry. My consent is not a condition of purchase. By entering I confirm that I am over age 25, agree to the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page.

Cruise Giveaway 1-888-973-0076
☐ To celebrate its reopening, a top cruise line is giving away 500 vacations to dozens of destinations across the Caribbean & Mexico. Take up to 2 years to travel.

3-Night Dream Vacation
☐ Pick from 22 amazing destinations like Orlando, Las Vegas, Branson, Miami, Myrtle, Pigeon Forge, Maui & more.

**Submit Entry**

*Dream Trips sponsors this promotion. Our customers save up to 85% on unsold vacations at leading resorts & cruise lines. No purchase required. This advertising material is being used for the purpose of soliciting the sale of timeshare property or interests in timeshare property. American Express Gift Cards and Business Gift Cards are issued by American Express Prepaid Card Management Corporation. For customer service, write American Express Gift Card Customer Care, PO Box 826, Fortson GA 31808.

Privacy Policy | Terms & Conditions | Official Rules

Connolly Decl. ¶ 8; *id.* Ex. B.

First, in terms of placement, the Website does not tuck away its statement regarding the Terms & Conditions in an obscure corner of the page where a user is unlikely to encounter it. Rather, the statement is located directly between the contact information fields and the "Submit Entry" button. The user is required to check the box indicating assent to the Terms & Conditions before any information is submitted. *Id.* ¶ 14. Thus, it is impossible that a user would miss seeing the statement regarding the Terms & Conditions or—at the very least—the checkbox indicating assent to them.

Second, rather than merely informing the user that the Terms & Conditions exist, the statement directs the user to the precise location where the Terms & Conditions can be accessed—namely, at the "bottom of the page."

Finally, and most significantly, the user is required to check an acknowledgement box to accept the Terms & Conditions before any information is submitted through the Website—an affirmative act indicating assent. The checkbox accompanies the statement, which specifically includes language indicating that the user "agree[s] to the Privacy Policy and Terms & Conditions." Thus, there is an explicit textual notice that checking the box will act as a manifestation of an intent to be bound. A reasonable user confronting a statement that "I consent to receive e-mail, SMS/Text messages, and calls about offers and deals from an automatic dialing system and/or pre-recorded voice technology" and "confirm that I am over age 25 [and] agree to the Privacy Policy and Terms & Conditions that are hyperlinked at the bottom of the page" would understand that he or she is assenting to the linked terms, including those pertaining to mandatory arbitration. And the record shows that Plaintiff indeed checked the box before clicking "Submit Entry." Connolly Decl. ¶ 20.

Plaintiff's objections to the design of the Website hold no water. Plaintiff assails the statement regarding the Website's Terms & Conditions as "lengthy" with "extremely small font

that blends into the background." Resp. at 9. But as seen in the screenshot of the Website on the day of Plaintiff's visit, the statement's text is clearly legible and not overly long. Indeed, it is roughly the same size and color as the text indicating the fields for "First Name," "Last Name," "Email," and "Phone Number." Plaintiff also objects to the placement of the link to the Terms & Conditions at the bottom of the page. *Id.* at 10. But, as discussed *supra*, that is precisely where the statement directed the user to view them.

### c. *Whether Defendant Is a Party to the Agreement*

Plaintiff argues that the Terms & Conditions purport to expressly bind Plaintiff and DreamTrips, LLC—the entity named as the owner of the Website—rather than Defendant.[1] Resp. at 12. Plaintiff further argues that the Terms & Conditions are ambiguous with respect to its use of the term "Partners" and that "there is nothing . . . that demonstrate[s] an intent to primarily and directly benefit Defendant." *Id.* at 13. Because the Court finds that Plaintiff agreed to the arbitration provision, the issue of whether Defendant is a party or a third-party beneficiary under the agreement is one for the arbitrator to decide in light of the delegation clause.

When parties agree to a delegation clause, there are only two issues a court must decide— if contested—before compelling arbitration. As discussed *supra*, one is "the making of the agreement for arbitration or the failure to comply therewith" if "in issue." 9 U.S.C. § 4. The other is a challenge specifically directed to the validity of the arbitration provision as opposed to the contract as a whole. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006). The

---

[1] Plaintiff also contends that there is no agreement because DreamTrips, LLC does not exist. Resp. at 10. Indeed, the record shows that the Website is owned and operated by Acquis, LLC, Mot. at 2, an entity mentioned nowhere on the Website or within the Terms & Conditions. But DreamTrips, LLC and its derivatives are fictitious names used by Acquis in its course of business. Reply at 8. And a party—such as Acquis—may enter a contract using its fictitious name, even if that fictitious name is not registered; the failure to register the name does not affect the validity of a contract using it. *Morburger v. J. Reporting, Inc.*, 318 So. 3d 619, 622 n.3 (Fla. 3d DCA 2021); *Worm World, Inc. v. Ironwood Prods., Inc.*, 917 So. 2d 274, 275 (Fla. 1st DCA 2005).

Eleventh Circuit has recognized "a two-step process required in considering the arbitrability of any contract containing an arbitration clause." *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 (11th Cir. 2012). Those steps are "1) resolution of any formation challenge to the contract containing the arbitration clause, in keeping with *Granite Rock*; and 2) determination of whether any subsequent challenges are to the entire agreement, or to the arbitration clause specifically, in keeping with *Prima Paint*." *Id.* (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).

Again, the Court must resolve Plaintiff's formation challenges notwithstanding the delegation clause, as it has. However, the second step is a non-issue because Plaintiff does not contest the validity of the arbitration provision itself—she contests only that any agreement was made to begin with. Thus, if Plaintiff's argument regarding Defendant's status as a party or third-party beneficiary falls into the first step—if it involves the making of the agreement—it is for the Court to decide. Otherwise, it is for the arbitrator to decide.

The Court finds that this argument does not go to the issue of whether Plaintiff agreed to the Terms & Conditions—including the arbitration provision therein—in the first instance. Given that this issue is not covered under either step discussed by the Eleventh Circuit in *Solymar*, the Court concludes that it is for the arbitrator to decide.

## CONCLUSION

Because Plaintiff has raised no genuine issue of fact regarding the validity of the arbitration agreement by (1) making an unequivocal denial that there was an agreement, and (2) producing evidence to substantiate the denial, as required under *Hilton*, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion [ECF No. 19] is **GRANTED**. Plaintiff's FAC [ECF No. 12] is **DISMISSED** *without prejudice*.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of January, 2022.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**